IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| v. | § | 1:14cr33-HSO-BWR-1 |
| | § | 1:20cv162-HSO |
| | § | |
| OLADIMEJI SEUN AYELOTAN | § | |

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT
OLADIMEJI SEUN AYELOTAN'S MOTION [1026] AND AMENDED
MOTION [1041] TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A
PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C. § 2255**

BEFORE THE COURT are Defendant Oladimeji Seun Ayelotan's Motion

[1026] and Amended Motion [1041] to Vacate, Set Aside, or Correct Sentence by a

Person in Federal Custody pursuant to 28 U.S.C. § 2255.  After due consideration of

the Motions, related pleadings, the record, and relevant legal authority, the Court is

of the opinion that the Motion [1026], the Amended Motion [1041], and the files and

records of the case conclusively show that Defendant Oladimeji Seun Ayelotan is

entitled to no relief and that his § 2255 Motions [1026], [1041] should be denied

without an evidentiary hearing.  *See* 28 U.S.C. § 2255(b).

## I. FACTS AND PROCEDURAL HISTORY

A.    The Second Superseding Indictment [156]

On October 7, 2014, Defendant Oladimeji Seun Ayelotan ("Defendant" or

"Ayelotan"), a citizen of Nigeria who was residing in South Africa, was charged in a

Second Superseding Indictment [156] in this case, along with numerous co-

Defendants, with three conspiracy charges (Counts 1, 2, and 9) and six different

violations of 18 U.S.C. §§ 2 and 1341 (Counts 3 through 8).  *See* 2d Superseding

Indictment [156] at 4-32.  Ayelotan was part of a conspiracy of "more than 200

members worldwide, with the leadership based in Nigeria and South Africa," which

"organization carried out multiple different types of schemes, each of which had the

purpose of fraudulently obtaining money or goods from U.S.-based victims."  PSR

[861] at 15 (filed under seal).  Among the fraud schemes perpetrated by the

conspirators were romance, advance-check, reshipping, postage-label, and account-

takeover scams, as well as money laundering.  *See id.* at 15-17.

B.   Ayelotan's jury trial

Ayelotan and two of his co-Defendants elected to proceed to a jury trial.  The

jury ultimately convicted Ayelotan of the crimes charged in Counts 1, 2, 3, 4, and 9

of the Second Superseding Indictment.  *See* Verdict Form [788] at 1-8.[1]  He was

convicted in Count 1 of conspiring to commit mail fraud, wire fraud, and money

laundering to unlawfully enrich the conspirators "by conducting multiple complex

financial fraud schemes via the internet," including "internet romance scams,

fraudulent check scams, bank and credit card account take overs, and work at home

scams." 2d Superseding Indictment [156] at 4-26.  The charge in Count 1 was

punishable by a term of imprisonment of not more than 30 years.  *See id.*; 18 U.S.C.

§§ 1341, 1343, 1344, & 1349.

Ayelotan's conviction in Count 2 was for conspiring to commit identify theft

as prohibited by 18 U.S.C. § 1028(a)(7), use of unauthorized access devices as

---

[1]  Counts 5, 6, 7, and 8 of the Second Superseding Indictment were dismissed at trial upon the Government's Motions.  *See* Order [777] at 1; Order [786] at 1.

prohibited by §§ 1029(a)(3) and 1029(a)(5), and theft of Government funds as prohibited by 18 U.S.C. § 641, all in violation of 18 U.S.C. § 371. This conviction carried a maximum term of imprisonment of five years. *See* 2d Superseding Indictment [156] at 26-29; 18 U.S.C. §§ 371, 1028, 1029.

With respect to Counts 3 and 4, the jury found that Ayelotan committed mail fraud by knowingly and unlawfully causing to be delivered by the United States Postal Service and private and commercial interstate and foreign carriers certain items, including 2 BlackBerry Torch smartphones (Count 3) and a check for $3,000.00 (Count 4). *See* 2d Superseding Indictment [156] at 30-31. Counts 3 and 4 were each punishable by a maximum of 20 years imprisonment. *See id.*; 18 U.S.C. § 1341.

Finally, Ayelotan was convicted in Count 9 of conspiring to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 2. *See* 2d Superseding Indictment [156] at 31-32. Specifically, he knowingly conducted and attempted to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity—bank, wire, and mail fraud. *See id.* at 32. This conviction carried a maximum sentence of 20 years imprisonment. *See id.*; 18 U.S.C. § 1956.

C.   Ayelotan's sentencing

In anticipation of sentencing, the United States Probation Office prepared a Presentence Investigation Report ("PSR"). *See* PSR [861] (filed under seal). Based upon a total offense level of 43 and a criminal history category of I, Ayelotan's Guidelines imprisonment range would have been life. *See id.* at 64. However,

because the statutorily authorized maximum sentences for each count of conviction combined were less than the maximum of the Guidelines range, the Guidelines range was reduced to 1,140 months. *See id.* (citing U.S.S.G. § 5G1.2(b)).[2] Following a lengthy sentencing hearing, the Court sentenced Ayelotan to a total of 1,140 months of imprisonment, consisting of terms of 360 months as to Count 1, 60 months as to Count 2, and 240 months as to each of Counts 3, 4, and 9, all to run consecutively. *See* J. [877] at 3.

Ayelotan and his two co-Defendants appealed, and the United States Court of Appeals affirmed in all respects. *See United States v. Ayelotan*, 917 F.3d 394, 399 (5th Cir.), *as revised* (Mar. 4, 2019). The United States Supreme Court denied Ayelotan's petition for a writ of certiorari on October 7, 2019. *See* Ex. [1009] at 1.

Ayelotan then filed a Motion [1026] to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody pursuant to 28 U.S.C. § 2255. *See* Mot. [1026]. Because the Motion [1026] did not conform to the requirements of Rule 2(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts (the "§ 2255 Rules"), the Court entered an Order [1028] granting Ayelotan leave to file an amended motion. *See* Order [1028] at 1-2. Ayelotan filed his Amended Motion [1041] on September 28, 2020. All grounds for relief asserted by Ayelotan are based upon alleged ineffective assistance of counsel by his trial and appellate attorneys. *See* Am. Mot. [1041].

Accordingly, the Court entered an Order [1043] requiring affidavits from each

---

[2] The maximum terms of imprisonment were 30 years for Count 1, five years for Count 2, 20 years for Count 3, 20 years for Count 4, and 20 years for Count 9, which totaled 95 years or 1,140 months.

of Ayelotan's former counsel and an answer by the United States Attorney. *See* Order [1043] at 1-3. Ayelotan's trial counsel, Robert Harenski ("Harenski" or "trial counsel"), and his appellate counsel, Jeffrey Hall ("Hall" or "appellate counsel") both filed Affidavits [1049], [1057] in Response to the § 2255 Motions. The Government then filed a Response [1065] in opposition, and Ayelotan has filed a Reply [1067] and two Supplemental Memoranda [1070], [1117].[3]

## II. DISCUSSION

A. Relevant legal standards

A prisoner may move to vacate, set aside, or correct his conviction or sentence under 28 U.S.C. § 2255 on any one of four grounds: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). Upon a finding that any one of these four grounds are present, a court "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

After the Government answers a § 2255 motion, the district court reviews the motion, the answer, any transcripts, and the record to determine whether an evidentiary hearing is warranted. *See* Rule 8 of § 2255 Rules. "A § 2255 motion requires an evidentiary hearing unless either (1) the movant's claims are clearly frivolous or based upon unsupported generalizations, or (2) the movant would not be

---

[3] The Supplemental Memoranda are essentially notices of supplemental authority.

entitled to relief as a matter of law, even if his factual assertions were true." *United States v. Harrison*, 910 F.3d 824, 826-27 (5th Cir. 2018), *as revised* (Dec. 19, 2018); *see also United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992) ("A motion brought under 28 U.S.C. § 2255 can be denied without a hearing only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief."). However, "[c]onclusory allegations, unsubstantiated by evidence, do not support the request for an evidentiary hearing." *United States v. Reed*, 719 F.3d 369, 373 (5th Cir. 2013).

"[A] claim of ineffective assistance of counsel is properly made in a § 2255 motion because it raises an issue of constitutional magnitude and, as a general rule, cannot be resolved on direct appeal." *United States v. Bass*, 310 F.3d 321, 325 (5th Cir. 2002). To demonstrate ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's ineffective assistance was prejudicial. *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984). "Failure to establish either prong defeats the claim." *Tucker v. Johnson*, 115 F.3d 276, 280 (5th Cir. 1997).

"For the deficiency prong, counsel's performance is to be accorded 'a heavy measure of deference.'" *United States v. Rivas-Lopez*, 678 F.3d 353, 357 (5th Cir. 2012) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 197 (2011)). To show prejudice, "*Strickland* asks whether it is 'reasonably likely' the result would have been different." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S.

at 694. The Supreme Court has defined a reasonable probability as a "probability sufficient to undermine confidence in the outcome." *Cullen*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at 694). "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

B.    Ayelotan's ineffective assistance claims

Ayelotan claims that his counsel was ineffective in allegedly failing to:

- object to the Court imposing consecutive sentences pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 3D1.1 (Ground One);
- object to "the Court's erroneous miscalculation" of intended loss (Ground Two);
- "seek a remedy for petitioner [for an] Article 36 violation of Vienna Convention" (Ground Three);
- "challenge the amount of victims that constitute the sentencing enhance[ment]" (Ground Four);
- "object to the Superseding Indictment, review and fully brief/place on record issues that would forbid the Government's Indictment of [sic] multiplicity grounds, as to Counts 3 and 4" (Ground Five);
- "challenge the term and agreement of the extradition treaty between the United States and South Africa" (Ground Six); and
- "provide movant copies of his trial transcripts, jury instructions, and sentencing transcripts" in order for him to prepare for his § 2255 proceedings (Ground Seven).

*See* Am. Mot. [1041] at 4-11;[4] Mem. [1042] at 3-36.[5] Ayelotan raises two additional

---

[4] Ayelotan's original § 2255 Motion [1026] advanced three grounds for relief, which were subsumed by his Amended Motion [1041]. To the extent there were any grounds raised in the original Motion [1026] that are not addressed here, the original Motion [1026] contained only vague and conclusory statements that did not confirm to the requirements of Rule 2(b) of the § 2255 Rules. *See* Order [1028] at 1. Therefore, no hearing or response from the Government on any such grounds was required. *See, e.g., United States v. Martinez*, 181 F.3d 627, 629 (5th Cir. 1999) (stating that "we do not think that [a defendant's] vague and conclusory assertion alone should be allowed to trigger a hearing or response from the government").

[5] Ayelotan's Memorandum [1042], Affidavit [1042-1], Reply [1067], and Supplemental Memoranda [117] are not signed under penalty of perjury, in contravention of Rule 2(b) of the § 2255 Rules. *See* Rule 2 of § 2255 Rules (stating in part that the motion must specify all grounds for relief, state the facts supporting each ground, state the relief requested, and "be signed under penalty of perjury by the movant or by a person authorized to sign it for

grounds in an Affidavit [1042-1] filed in support of his Amended Motion [1041] and

Memorandum [1042], specifically:

- his trial counsel's alleged failure to visit him in jail and prepare for trial (Ground Eight); and
- his appellate counsel's purported failure to communicate with him (Ground Nine).

*See* Aff. [1042-1] at 2, 4.[6]

1.  Ground One: Imposition of consecutive sentences under U.S.S.G. § 3D1.1

a.  Ayelotan's claims

Ayelotan asserts that his trial counsel was ineffective for failing to object,

purportedly under U.S.S.G. § 3D1.1, to the consecutive sentences imposed by the

Court.  *See* Am. Mot. [1041] at 4; Aff. [1042-1] at 3.  He contends that Counts 1, 2, 3,

4, and 9 should have been grouped pursuant to § 3D1.2(d), such that he would have

received concurrent sentences, *see* Mem. [1042] at 5-6, and that, had trial counsel

objected, he would have received a sentence with a maximum term of imprisonment

of 30 years for all of his convictions, instead of the 95-year term that he received,

because the highest statutory cap for any charge was 30 years, *see id.* at 6; *see also*

Reply [1067] at 4-9.  Ayelotan posits that "where one conviction in a multi-count

case contains a restrictive statutory maximum sentence, the sentencing Guidelines

---

the movant"). Ayelotan's Amended Motion [1041] is signed under penalty of perjury but contains only conclusory statements of his grounds for relief, *see* Am. Mot. [1041], with the lion's share of his allegations contained in his unsworn Memorandum [1042] and Affidavit [1042-1].  "Conclusory allegations, unsubstantiated by evidence, do not support the request for an evidentiary hearing."  *United States v. Reed*, 719 F.3d 369, 373 (5th Cir. 2013). However, even if the Court considered the allegations made in the unsworn documents, the result would not change.

[6] Because the Court used the 2016 Guidelines Manual to calculate Ayelotan's offense level at sentencing, it will likewise utilize the 2016 Manual in addressing Ayelotan's § 2255 Motions.  *See* P.S.R. [861] at 59 (filed under seal).

provide that the sentence of the conviction carrying the restrictive maximum shoudld [sic] run concurrently with the conviction capable of accommodating the sentence." Reply [1067] at 4-5 (citing U.S.S.G. § 5G1.2(c)). Ayelotan claims that the sentence imposed was not based on facts reflected in the jury verdict or admitted by him, such that the penalty for his crimes was improperly increased. *See id.*[7]

Ayelotan's trial counsel states that, other than the issue of computation and amount of loss, "the Guidelines were, in fact, calculated properly." Aff. [1057] at 1. Trial counsel did not lodge objections concerning the grouping of offense levels and consecutive sentences because, in his experience, such "frivolous objections usually hurt the Defendant." *Id.* at 2. The Government responds that because Defendant's total offense level of 47 exceeded the maximum level of 43 under the Guidelines, Ayelotan's total offense level was reduced to 43, which called for a term of life imprisonment. *See* Resp. [1065] at 4. In light of statutory maximum sentences for each Count of conviction, U.S.S.G. § 5G1.2(d) directed that the sentences were properly run consecutively in order to achieve a life sentence. *See id.*

b.   <u>Analysis</u>

U.S.S.G. § 3D1.1 provides that, in order to determine an offense level on multiple counts, "[w]hen a defendant has been convicted of more than one count, the court shall . . . [g]roup the counts resulting into conviction . . . by applying the rules

---

[7] Ayelotan's Ground Five, which concerns the purported multiplicity of the charges, asserts that "his convictions were in the same scheme of the instance [sic] offense and therefore should have received a concurrent sentence by grouping the offenses pursuant to U.S.S.G. § 3D1 [sic] during sentencing phase." Mem. [1042] at 26. But this argument is more relevant to Ground One, as it is discussed here. To the extent Ayelotan raises a separate objection in Ground Five on the same basis, his Motion should be denied for the same reasons stated here.

specified in § 3D1.2." U.S.S.G. § 3D1.1(a) (2016).  Ayelotan conflates the grouping of counts for purposes of determining a defendant's offense level under U.S.S.G. § 3D1.2 (2016) with the ordering of consecutive sentences under § 5G1.2 (2016) for multiple counts of conviction.[8]  Under the Guidelines, a court must first determine a defendant's Guidelines imprisonment range based upon his adjusted offense level and criminal history category, and then decide the appropriate "total punishment" or "combined length of the sentences." U.S.S.G. § 5G1.2 app. n.1 (2016).

Because the maximum punishment for the Count of conviction carrying the highest statutory maximum in Ayelotan's case, Count 1, was less than the total punishment called for under the Guidelines, the Court ordered consecutive sentences "only to the extent necessary to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G1.2(d) (2016).  As trial counsel stated, "the Guidelines were, in fact, calculated properly." Aff. [1057] at 1.  Any objection to this procedure would have been frivolous, *see* U.S.S.G. § 5G1.2(d) (2016), and failure to make a frivolous objection cannot constitute ineffective assistance of counsel, *see United States v. Preston*, 209 F.3d 783, 785 (5th Cir. 2000); *see also Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) (holding that "failure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness").

Ayelotan also insists that the sentence was not based on facts reflected in the

---

[8]  U.S.S.G. §§ 3D1.2 and 5G1.2 were not substantively amended between the 2013 version of the Guidelines in effect when Ayelotan was indicted and the 2016 one in effect when he was sentenced.  *Compare* U.S.S.G. §§ 3D1.2 and 5G1.2 (2016), *with* U.S.S.G. §§ 3D1.2 and 5G1.2 (2013).

jury verdict or admitted by him, *see* Mem. [1042] at 5, an argument which hints at a challenge under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 570 U.S. 99 (2013).  In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi*, 530 U.S. at 490.  *Alleyne* held that facts which increase mandatory minimum sentences must also be submitted to the jury and found beyond a reasonable doubt.  *Alleyne*, 570 U.S. at 116.  It is plain from the record that the Court did not increase any statutory minimum or maximum sentences for Ayelotan's convictions; neither *Apprendi* nor *Alleyne* have any applicability to this case.

The Fifth Circuit has recognized a "clean division of labor" between a jury and a district judge:

> absent waiver of a jury trial, statutory findings (whether the defendant is guilty or not guilty and whether his conduct meets the test for a statutory minimum or maximum) are for jurors to decide, while sentencing within the statutory minimums and maximums following a guilty verdict and applying the Sentencing Guidelines is for the district judge to decide.

*United States v. Leontaritis*, 977 F.3d 447, 451 (5th Cir. 2020), *cert. denied*, 211 L. Ed. 2d 178 (Oct. 12, 2021).  In Ayelotan's case, the Court applied the advisory Guidelines to determine a sentence within each crime's statutory minimum and maximum sentence, a decision well within the Court's authority.  *See id.*  As such, Ayelotan cannot show either prong of an ineffective assistance of counsel claim as to Ground One.

2.    Ground Two: Calculation of intended loss

a.    Ayelotan's claims

Ayelotan asserts that his trial counsel was ineffective when he failed to object to the Court's "erroneous miscalculation" of intended loss as to him. Am. Mot. [1041] at 5; *see* Reply [1067] at 11-21. The PSR determined that the total loss attributable to Ayelotan was $55,354,756.71, and because the amount of loss exceeded $25,000,000.00, his base offense level of 7 was increased by 22 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(L). *See* PSR [861] at 21-22, 60 (filed under seal).[9] Ayelotan maintains that "[t]he scope of the criminal activity jointly undertaken by [him] is not necessarily the same as the scope of the entire conspiracy," and thus, "relevant conduct is not necessarily the same for every participant in the conspiracy." Mem. [1042] at 8.

Ayelotan argues that under U.S.S.G. § 1B1.3, his relevant conduct for sentencing purposes extended only as far as the scope of his criminal activity, and that the Court allegedly failed to determine the scope of the criminal conduct he jointly agreed to undertake, resulting in an excessive total amount of intended loss attributed to him. *See id.* at 8-10; *see* Reply [1067] at 12-15; Suppl. Br. [1070] at 1-2. According to Ayelotan, the Court erred when it determined that the loss attributable to him could be reasonably estimated without impermissible speculation and when it purportedly failed to make the requisite factual findings in order to calculate loss. *See* Reply [1067] at 18. Trial counsel allegedly "[f]ailed to

---

[9]  Due to various other increases under § 2B1.1, Ayelotan's resulting base offense level was 39. *See* PSR [861] at 60 (filed under seal).

challenge the particularized finding as [to] the scope of Ayelotan['s] agreement with co-defendant[s] Susan Anne Ville-neuve [sic], Gabriel Oludare Adeniran and Emmanuel Adeniyi Osokomaiya," which purportedly resulted in $26,000,000.00 in additional loss being erroneously attributed to Ayelotan. *Id.* at 12-13; *see id.* at 16-17.

Ayelotan cites $24,279,788.65 in fraudulent or counterfeit checks he says were generated by co-Defendant Susan Villeneuve ("Villeneuve") and argues that this amount should not have been included in his loss calculation because there was no evidence of jointly undertaken activity between him and Villeneuve. *See id.* at 13; Mem. [1042] at 12. He further contends that the Court erred by including losses for each of the 37,817 credit card numbers listed in his PSR because the Government failed to show the viability of the devices, such as through expert testimony, and because he possessed only approximately 900 such devices. *See* Mem. [1042] at 12-14, 16. Ayelotan further takes issue with the Court employing a "bright-line rule" of a $500.00 minimum loss amount for each gift card, no matter its actual value, in calculating loss. *See* Reply [1067] at 20. Finally, Ayelotan states that the 3,400 mailing or shipping labels for individual packages used to calculated intended loss were for the entire conspiracy, and the Court did not make an individualized finding as to how many should be attributed to him. *See* Mem. [1042] at 14-15.

Ayelotan faults counsel for failing to object to the foregoing miscalculations, *id.* at 11, and for failing "to argue about the loss amount, intended loss calculation during the jury presence," Aff. [1042-1] at 3. Ayelotan insists that "the loss amount

necessary to support an increase in the base offense level under U.S.S.G. §
2B1.1(b)(1) is an 'element' of the offense that must be charged in the indictment,
submitted to a jury, and proved beyond a reasonable doubt to satisfy the fifth and
six [sic] amendments."  Reply [1067] at 11-12; *see id.* at 15-16.

Ayelotan's trial counsel points out that he did in fact object to the PSR's
computations and the amount of loss alleged by the Government, *see* Aff. [1057] at
1-2, and he directs the Court's attention to the Objections to the PSR, which he
attached as Exhibit "A" to his Affidavit, and which clearly reflect that he did in fact
lodge objections in this regard, *see id.* at 2; Ex. [1057-1].  The Government also cites
trial counsel's specific objection to the loss calculation and states that "a significant
amount of time at the sentencing hearing was spent on the issue of the loss
calculation."  Resp. [1065] at 4.  According to the Government, the Court made a
reasonable estimate of the loss based upon the totality of information before it,
including the testimony of three agents at the sentencing hearing.  *See id.* at 4-5.

b.   Analysis

(1)   Relevant legal authority

Because Ayelotan was convicted of fraud offenses referenced to U.S.S.G.
§ 2B1.1, and some of those offenses (Counts 1, 3, and 4) carried "a statutory
maximum term of imprisonment of 20 years or more," his base offense level under
the Guidelines was 7.   U.S.S.G. § 2B1.1(a)(1) (2016).  Because the loss exceeded
$6,500.00, the Guidelines directed that Ayelotan's offense level be increased based
upon the amount of loss.  *See* U.S.S.G. § 2B1.1(b)(1) (2016).

Subject to certain exclusions not relevant here, loss is defined as "the greater

of actual loss or intended loss."  U.S.S.G. § 2B1.1 app. n.3(A) (2016).  "'Actual loss'

means the reasonably foreseeable pecuniary harm that resulted from the offense,"

*id.*, while

> "[i]ntended loss" (I) means the pecuniary harm that the defendant
> purposely sought to inflict; and (II) includes intended pecuniary harm
> that would have been impossible or unlikely to occur (e.g., as in a
> government sting operation, or an insurance fraud in which the claim
> exceeded the insured value),

*id.*  "The court need only make a reasonable estimate of the loss."  U.S.S.G. § 2B1.1

app. n.3(C) (2016).

In making this determination, a court must examine a defendant's "relevant

conduct."  U.S.S.G. § 1B1.3 (2016).  This includes:

> (1) (A) all acts and omissions committed, aided, abetted, counseled,
> commanded, induced, procured, or willfully caused by the
> defendant; and
> (B) in the case of a jointly undertaken criminal activity (a criminal
> plan, scheme, endeavor, or enterprise undertaken by the defendant
> in concert with others, whether or not charged as a conspiracy), all
> acts and omissions of others that were—
>> (i)     within the scope of the jointly undertaken criminal activity,
>> (ii)    in furtherance of that criminal activity, and
>> (iii)   reasonably foreseeable in connection with that criminal
>>         activity;
> that occurred during the commission of the offense of conviction, in
> preparation for that offense, or in the course of attempting to avoid
> detection or responsibility for that offense . . . .

*Id.* § 1B1.3(a)(1).[10]

After the Court resolved the objections lodged by Ayelotan's counsel and

---

[10] There were some amendments to U.S.S.G. §§ 1B1.3(a) and 2B1.1(b)(1) between the date of
Ayelotan's indictment in 2014 and the 2016 Guidelines Manual in effect when he was
sentenced.  However, there do not appear to be any *ex post facto* concerns.  *See* U.S.S.G.
§ 1B1.11.  Indeed, the offense level increase under § 2B1.1(b)(1) based upon the amount of
loss was more favorable in the later version used at sentencing.  *Compare* U.S.S.G.
§ 2B1.1(b)(1) (2016) (22 level offense increase for losses exceeding $25,000,000.00), *with*
U.S.S.G. § 2B1.1(b)(1) (2013) (22 level increase for losses exceeding only $20,000,000.00).

those of co-Defendants at sentencing, it found that a total intended loss amount of $52,150,553.71 was attributable to Ayelotan under the doctrine of relevant conduct. *See* Tr. [951] at 247-48.  Because the loss exceeded $25,000,000.00, but was less than $65,000,000.00, Ayelotan's offense level was increased by 22 levels.  *See* U.S.S.G. § 2B1.1(b)(1) (2016).

 (2) Counsel's alleged failure to object to the loss calculation

 Ayelotan's claim that his trial counsel was ineffective when he failed to object to the calculation of intended loss is simply not correct.  *See* Am. Mot. [1041] at 5; Reply [1067] at 11-21.  As the First Supplemental Addendum to the PSR relayed, trial counsel "filed a submission which is characterized as a challenge to the sufficiency of the government's evidence with a particular focus on the loss attributed to the defendant as part of the guideline calculation."  PSR [861-2] at 1 (filed under seal).  Trial counsel's Objection asserted that "the Government presented very little proof of 'actual loss'"; the Government did not verify "(except in a very small number of cases) that the identities ascribed as 'stolen', were actually identities of real people"; and "[t]he jury did not reach a determination as to the amount of 'actual loss.'"  Obj. [861-3] at 1-2 (filed under seal).  Trial counsel argued that Ayelotan should not be assigned loss amounts where the Government was unable to demonstrate that the direct and proximate result of Ayelotan's conduct were losses identified in the case.  *See id.* at 2-3.  The record conclusively demonstrates that Ayelotan's counsel was not ineffective in failing to raise any objection to the loss calculation because he did in fact object.  As such, his representation did not fall below an objective standard of reasonableness as to this

issue.  *See Strickland,* 466 U.S. at 687-88.

Moreover, as the Court stated at the sentencing hearing,

in the event it erred in treating or calculating any of the guidelines in this case or in resolving any of the objections, the Court would have imposed the identical sentences imposed here today as a variance or nonguideline sentence based on the offense conduct in this case and the other relevant statutory sentencing factors found at Title 18, United States Code, Section 3553 . . . .

Tr. [951] at 275.  Thus, even if counsel had failed to object to the loss calculations, there was no prejudice to Ayelotan.  *See Strickland,* 466 U.S. at 687-88.  The record conclusively shows that Ayelotan is entitled to no relief on this theory.  *See Harrison*, 910 F.3d at 826-27; *Bartholomew*, 974 F.2d at 41.

(3)  <u>Failure to object to scope of the conspiracy in calculating loss</u>

Ayelotan contends that "[t]he scope of the criminal activity jointly undertaken by [him] is not necessarily the same as the scope of the entire conspiracy," and thus, "relevant conduct is not necessarily the same for every participant in the conspiracy."  Mem. [1042] at 8.  He insists that the Court did not determine the scope of the criminal conduct he jointly agreed to undertake, which led to a higher total amount of intended loss attributed to him.  *See id.* at 8-10; *see* Reply [1067] at 12-15; Suppl. Br. [1070] at 1-2.  Specifically, Ayelotan argues that his attorney's purported failure to raise an objection concerning the scope of his agreement with co-Defendants Villeneuve, Adeniran, and Osokomaiya resulted in $26,000,000.00 in additional loss being attributed to him, constituting ineffective assistance of counsel.  Reply [1067] at 12-13, 16-17; Mem. [1042] at 12.

Ayelotan's counsel did object to the inclusion of the $26,000,000.00 in the loss

17

amount attributable to Ayelotan. *See* Obj. [861-3] at 3 (filed under seal). At the sentencing hearing, the Court heard evidence, testimony, and argument concerning the proper amount of loss that should be attributed to Ayelotan. *See* Tr. [951]. The Court also had the benefit of the testimony and evidence presented at Ayelotan's lengthy jury trial. Based upon the Court's consideration of the applicable law, it determined that the full $52,150,553.71 loss was attributable to Ayelotan. *See id*. at 247-248. The Court therefore properly considered relevant conduct in making the loss determination, and any additional objection regarding the failure to do so would have been frivolous. *See id*.; *Preston*, 209 F.3d at 785.

To the extent any additional objection on this subject would not have been frivolous, Ayelotan cannot show prejudice because even if the loss amount were reduced by $26,000,000.00, the result would not change. *See* Reply [1067] at 12-13, 16-17; Mem. [1042] at 12. Subtracting this amount from the Court's calculated loss of $52,150,553.71 would result in a loss amount of $26,150,553.71 still attributable to Ayelotan. *See* Tr. [951] at 247-48. Because this residual figure would exceed $25,000,000.00, Ayelotan's offense level would still have been increased by 22 levels, and the result would have been the same with respect to his offense level. *See* U.S.S.G. § 2B1.1(b)(1) (2016). The Court's statement at sentencing that even if it had erred in calculating the Guidelines or in resolving any objections, it would have imposed the identical sentences as a variance or non-Guideline sentence further obviated any prejudice. *See* Tr. [951] at 275.

In sum, the record conclusively shows that Ayelotan cannot demonstrate either of the *Strickland* prongs as to this issue, and no hearing is necessary. *See*

*Harrison*, 910 F.3d at 826-27; *Bartholomew*, 974 F.2d at 41.

(4)   Failure to object to viability of credit card devices

Ayelotan next contends that the Court erred by including losses for each of the 37,817 credit card numbers identified in the PSR because the Government failed to show the viability of the devices, such as through expert testimony, and because he possessed only approximately 900 of the devices, such that only the intended losses associated with those credit card numbers should have been included. *See* Mem. [1042] at 12-14, 16. To the extent Ayelotan argues that his attorney should have objected to inclusion of these credit card numbers in calculating loss, his counsel did in fact lodge this objection, rendering this argument frivolous. *See* Obj. [861-3] at 3-4 (filed under seal).

At sentencing, Ayelotan's counsel as well as that of his co-Defendants vehemently argued against the inclusion of loss for all 37,817 credit card numbers, or unauthorized access devices, listed in the PSR. *See* Tr. [951]. The Court ultimately found those objections unpersuasive and overruled them. *See, e.g., id.* at 182-85, 241-42.

Any specific argument that Ayelotan's counsel would have raised that he should have been held accountable only for the loss associated with 900 credit card numbers would have completely disregarded any relevant conduct and would have been patently frivolous under the facts of this case. Thus, any failure by counsel to argue that Ayelotan was only responsible for the loss from 900 credit card numbers could not have constituted ineffective assistance of counsel. *See Preston*, 209 F.3d at 785; *Green*, 160 F.3d at 1037. And again, the Court stated at sentencing that it

19

would have imposed the identical sentence as a variance or non-Guideline sentence based on the relevant statutory sentencing factors set forth at 18 U.S.C. § 3553. *See* Tr. [951] at 275. Ayelotan's § 2255 Motion concerning the viability of the credit cards should be denied without an evidentiary hearing. *See Harrison*, 910 F.3d at 826-27; *Bartholomew*, 974 F.2d at 41.

     (5)   <u>Failure to object to a "bright-line rule" of $500.00 minimum loss</u>

     Ayelotan also takes issue with the Court employing a "bright-line rule" of a $500.00 minimum loss amount for each credit card, no matter its value, in calculating loss. *See* Reply [1067] at 20. The Application Notes to U.S.S.G. § 2B1.1 (2016) clearly stated that, "[i]n a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and *shall be not less than $500 per access device*." U.S.S.G. § 2B1.1 app. n.3(F)(i) (2016) (emphasis added).[11] Because the minimum loss for each access device under the Guidelines was $500.00, the Court did not err in calculating loss based upon $500.00 per credit card number. *See id.* Ayelotan's proposed objection would have been frivolous and cannot support an ineffective assistance of counsel claim. *See Preston*, 209 F.3d at 785; *Green*, 160 F.3d at 1037. Because Ayelotan cannot show that his counsel's representation fell below an objective standard of reasonableness in this regard, or that any alleged ineffective assistance of counsel was prejudicial, this ground for relief should be denied without an evidentiary hearing. *See Strickland,* 466 U.S. at 687-88;

---

[11] The 2013 Guidelines contained the same Application Note. *See* U.S.S.G. § 2B1.1 app. n.3(F)(i) (2013).

*Harrison*, 910 F.3d at 826-27; *Bartholomew*, 974 F.2d at 41.

    (6)    <u>Consideration of 3,400 mailing or shipping labels</u>

Ayelotan posits that the 3,400 mailing or shipping labels for individual packages used to calculate intended loss were for the whole conspiracy, and that the Court did not make an individualized finding as to how many should be attributed to him. *See* Mem. [1042] at 14-15. As the Court has already explained, it did examine Ayelotan's relevant conduct at sentencing in assessing the loss attributable to him. This argument is unavailing.

To the extent Ayelotan claims that his attorney failed to raise an objection concerning the mailing or shipping labels, he is again plainly incorrect. *See* Obj. [861-3] at 4 (filed under seal). In a formal Objection filed in response to the PSR, counsel argued that the United States Postal Inspector's statement that "the loss could be as high as $300,000.00" for the "Postage Label Scam" was speculative because the Inspector was "unsure exactly" of the amount of loss. *See id.* Ayelotan's counsel similarly argued at sentencing that the evidence did not support a loss amount based upon the number of mailing labels used in the PSR. *See, e.g.,* Tr. [951] at 10-11. The Court considered documentary and testimonial evidence and overruled the objection. *See id.* at 244. Because Ayelotan's counsel did in fact object to inclusion of loss for the labels, any argument that counsel was ineffective counsel for failing to do so lacks merit.

Nor can Ayelotan demonstrate prejudice. As the Court discussed earlier, reducing the $52,150,553.71 calculated loss amount by $26,000,000.00 as Ayelotan argued, would have resulted in a loss amount of $26,150,553.71. *See* Reply [1067]

at 12-13, 16-17; Mem. [1042] at 12; Tr. [951] at 247-48.  Even if the Court were to

further reduce this figure by the $300,000.00 mailing label loss of which Ayelotan

complains, the loss amount would still remain above $25,000,000.00, again

resulting in Ayelotan's offense level being increased by 22 levels.  *See* U.S.S.G.

§ 2B1.1(b)(1) (2016).   Ayelotan cannot show prejudice because his offense level

would remain the same whether or not the $300,000.00 loss for mailing labels were

included.

Finally, because the Court found that it would have imposed the identical

sentence as a variance or non-Guidelines sentence, *see* Tr. [951] at 275, Ayelotan

cannot show prejudice.  This ground should be denied without an evidentiary

hearing.

(7)   Failure to argue the intended loss calculation in jury's presence

Ayelotan next maintains that trial counsel "failed to argue about the loss

amount, intended loss calculation during the jury presence."  Aff. [1042-1] at 3.  He

posits that "the loss amount necessary to support an increase in the base offense

level under U.S.S.G. § 2B1.1(b)(1) is an 'element' of the offense that must be

charged in the indictment, submitted to a jury, and proved beyond a reasonable

doubt to satisfy the fifth and six [sic] amendments."  Reply [1067] at 11-12; *see id.* at

15-16.

Ayelotan is mistaken, as no jury finding was required with respect to loss

amount under the Guidelines.  The Court was required to calculate the loss amount

in order to determine the appropriate advisory Guidelines range.  *See, e.g.,* U.S.S.G.

§ 2B1.1 app. n.3(C) (2016) ("The court need only make a reasonable estimate of the

loss.  The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence.").[12]  The Court properly applied the Sentencing Guidelines and sentenced Ayelotan within the statutory range for each Count of conviction; this did not require the question of loss amount to be submitted to the jury.  *See Leontaritis*, 977 F.3d at 451.  Any objection on this basis would have been frivolous, and failure to raise such a patently frivolous objection cannot constitute ineffective assistance of counsel.  *See id.*; *Preston*, 209 F.3d at 785.

> (8)   The Court's alleged miscalculation of the Guidelines

Finally, to the extent Ground Two of Ayelotan's Motion asserts that the Court miscalculated the loss attributable to him, such a claim is not cognizable under § 2255.  *See, e.g., United States v. Segler,* 37 F.3d 1131, 1134 (5th Cir. 1994) ("A district court's technical application of the Guidelines does not give rise to a constitutional issue cognizable under § 2255."); *United States v. Mitchell*, 263 F.3d 162, 2001 WL 803560, at *4 (5th Cir. 2001) ("Mitchell's claim that his sentence was incorrectly calculated under the guidelines is not cognizable in a § 2255 motion."). Moreover, Ayelotan could have raised this issue on direct appeal but did not, and he has not demonstrated cause and prejudice to overcome the procedural bar to raising it for the first time in his § 2255 Motion.  *See United States v. Lopez*, 248 F.3d 427, 433 (5th Cir. 2001) (holding that a defendant procedurally defaults a claim by failing to raise it on direct review, and that the "claim may be raised in habeas proceedings only if he is able to demonstrate cause and prejudice").   Finally,

---

[12]  The same Application Note appeared in the 2013 Guidelines.  *See* U.S.S.G. § 2B1.1 app. n.3(C) (2013).

Ayelotan cannot show prejudice because, as the Court stated at sentencing, it would have imposed the same sentence as a variance or non-Guidelines sentence.  *See* Tr. [951] at 275.

In sum, as to Ground Two in Ayelotan's Motion, it is not "'reasonably likely' the result would have been different." *Harrington*, 562 U.S. at 111.  Because the record shows that Ayelotan is not entitled to any relief on this Ground, no evidentiary hearing is required.  *See Harrison*, 910 F.3d at 826-27; *Bartholomew*, 974 F.2d at 41.

3.   Ground Three: Failure to object as to Article 36 of the Vienna Convention of Consular Relations

a.   Ayelotan's claims

Ayelotan contends that his trial counsel was ineffective because he failed to seek a remedy based upon a purported violation of Article 36 of the Vienna Convention on Consular Relations.  *See* Am. Mot. [1041] at 7; Reply [1067] at 23-25. According to Ayelotan, the Indictment charged criminal activity "from at least 2001 through April 9, 2014 (the date of the Indictment)," and he "was held in custody in South Africa for over 1 years [sic] during the alleged period" before being extradited to the United States on July 9, 2015.  Mem. [1042] at 17.  Ayelotan claims that he was arrested in Pretoria, South Africa, and that prior to his extradition to the United States, he "attempted to contact Nigeria[n] Consular to South Africa for assistance but Interpol and U.S. Marshalls [sic] quickly flew him out of South Africa, denying him that right and the right to appeal his extradition through the Constitutional Court in South Africa."  *Id.*; Aff. [1042-1] at 2.

Ayelotan states that while he was detained at a correctional facility in South Africa, "he was photograph[ed] illegally to put on documents fraudulently as to extradite him by use of private airport violating his right to consular help," Mem. [1042] at 17-18, and that "[t]he United States Government and the South African Government violated [his] due process rights by extraditing [him] to the United States of America without notifying [his] government about [his] arrest on May 20th 2014," Aff. [1042-1] at 2. Ayelotan does acknowledge that an officer with the "South African Interpol" made numerous attempts to obtain documents at the Nigerian Embassy in South Africa, which "the embassy refused to provide due to his suspicious request during a pending case in South Africa High Court in Pretoria. Because [sic] defendant was still appealing his extradition." *Id.*

Ayelotan next complains that after counsel was appointed to represent him in July 2015, he asked his trial counsel to contact the Nigerian Embassy in Washington, D.C., for assistance, and trial counsel "stated that he would but never did." Mem. [1042] at 18. Trial counsel purportedly "never mentioned any rights that Mr. Ayelotan had as being a foreign National or even attempt[ed] to alert the Court as to a request to [sic] consular assistance under the Vienna Convention on Consular Relations, Art. 36." *Id.* According to Ayelotan, his trial counsel "refused to notify [his] embassy about [his] arrest and extradition," *id.*, which "denied him the protection needed," Mem. [1042] at 19, "led him to make serious legal missteps," *id.* at 20, and prejudiced him because it "caused him to suffer in trial by not properly understanding those charges or the severe punishment if found guilty," *id.* at 18.

b.    Trial counsel's Affidavit and the Government's Response

Ayelotan's trial counsel counters that "he did contact the Nigerian Consulate/ Embassy and ask for any help they could provide in defending Mr. Ayelotan," but that "[a]ll requests were verbally denied."  Aff. [1057] at 2.  Moreover, "[a]ssuming *arguendo* that Mr. Ayelotan's contention was correct," Ayelotan "has failed to state how having Consular access would help to decrease or change his Sentence."  *Id.*

The Assistant United States Attorney responds that "[t]o the best of counsel's recollection Nigerian officials in South Africa were notified at the time of the arrests in South Africa," and the United States Department of Justice Office of International Affairs "was involved throughout the process of the judicially approved extraditions."  Resp. [1065] at 6.  The Government points out that Ayelotan's counsel reached out to the Nigerian Consulate, which denied his request for assistance.  *See id.*  Even if counsel made no such request, the Government argues that Ayelotan has not alleged or shown that it would have made a difference in the outcome.  *See id.*  As the Government puts it, "Ayelotan cannot show a realistic prospect that consular assistance could have assisted him, much less that it would have assisted him."  *Id.*

c.    Analysis

Ayelotan appears to seek § 2255 relief based upon alleged violations of Article 36 of the Vienna Convention by United States and South African authorities, as well as based upon his attorney's purported failures to inform him of his rights under the Vienna Convention, to contact the Nigerian Embassy as requested, and to inform the Court of the alleged violations of Article 36.  *See, e.g.,* Am. Mot. [1041] at

7; Mem. [1042] at 17-18; Aff. [1042-1] at 2; Reply [1067] at 23-25.

Article 36 "addresses communication between an individual and his consular officers when the individual is detained by authorities in a foreign country." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 337 (2006). It provides in relevant part as follows:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
   (a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;
   (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;
   (c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment.

Vienna Convention on Consular Rels. & Optional Protocol on Disps., art. 36, T.I.A.S. No. 6820, 21 U.S.T. 77; *see also, e.g.,* 28 C.F.R. § 50.5 (establishing uniform procedure in the Department of Justice for the notification of consular officers upon the arrest of foreign nationals).

The United States Court of Appeals for the Seventh Circuit has summarized Article 36 as imposing

> three separate obligations on a detaining authority: (1) inform the consulate of a foreign national's arrest or detention without delay; (2) forward communications from a detained national to the consulate without delay, and (3) inform a detained foreign national of "his rights" under Article 36 without delay.

*Osagiede v. United States*, 543 F.3d 399, 402 (7th Cir. 2008).

Although Ayelotan seeks relief under § 2255 for alleged violations of Article 36, "the Vienna Convention does not confer individually enforceable rights." *Cardenas v. Dretke*, 405 F.3d 244, 253 (5th Cir. 2005).  A treaty constitutes a contract between or among independent nations, and as such, it does not "generally create rights that are enforceable in the courts."  *United States v. Jimenez-Nava*, 243 F.3d 192, 195 (5th Cir. 2001).  "[T]he implementation of the treaty by the Federal government is wholly different from the implication that it may be enforced in court by individual detainees."  *Id.* at 198.  Thus, Ayelotan has no individual enforceable rights under the treaty.

Moreover, Ayelotan could have raised this issue on direct appeal but did not, and he has not shown cause and prejudice to overcome the procedural bar to raising it for the first time on collateral review.  *See Lopez*, 248 F.3d at 433.  Ayelotan's request for relief for an Article 36 violation is unavailing for this reason as well.  *See id.*; *Cardenas*, 405 F.3d at 253.

To the extent Ayelotan could seek habeas relief based upon ineffective assistance of counsel on this theory, and assuming for the sake of argument that trial counsel's representation in this regard fell below the Sixth Amendment standard of reasonableness, Ayelotan's conclusory allegations of prejudice are insufficient to warrant relief.  *See United States v. Holmes*, 406 F.3d 337, 361 (5th

Cir. 2005) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue.").  Ayelotan speculates about what the Nigerian Embassy could have done to assist with his case, *see* Mem. [1042] at 20 (speculating as to what "[t]he Consulate *could* have" done had the Embassy been contacted contacted (emphasis added)), and he has not offered any evidence to show that any contact with the Consulate would have made it "reasonably likely" that the result in this case would have been different, *see Harrington*, 562 U.S. at 111.[13]

Based upon the foregoing, Ayelotan cannot show prejudice under *Strickland* on this Ground.  *See id.*; *see also, e.g., Sandoval v. United States,* 574 F.3d 847, 851 (7th Cir. 2009) (finding no prejudice when § 2255 petitioner alleged ineffective assistance claims related to Article 36 because petitioner "ha[d] not shown that the Mexican consulate would have chosen to assist him," nor "what type of assistance the consulate could have provided that would have helped his case").[14]  The record conclusively demonstrates that Ayelotan is entitled to no relief under § 2255 on this issue, and his claims concerning the Vienna Convention should be denied without an evidentiary hearing.  *See Harrison*, 910 F.3d at 826-27; *Bartholomew*, 974 F.2d at 41; *see also, e.g., United States v. Duran*, 934 F.3d 407, 411 (5th Cir. 2019) (recognizing that "there is no need for an evidentiary hearing" if a motion "consists

---

[13] Ayelotan was provided with Court-appointed attorneys at all stages of the proceedings, as well as interpreters to assist with any language barrier.

[14] Ayelotan claims that he was prejudiced because he did not understand the charges against him or the potential penalties, but the Magistrate Judge clearly advised Ayelotan at his initial appearance on the Second Superseding Indictment of the charges pending against him and the maximum penalties associated with each charge.  *See* Audio File [360].

of conclusory allegations").

4.      Ground Four: Number of victims

a.      Ayelotan's claims

Ground Four alleges that trial counsel was ineffective for failing to challenge the number of victims used to apply a sentencing enhancement under U.S.S.G. § 2B1.1(b)(2)(C), on the theory that there was insufficient evidence presented at sentencing to support a six-level increase to the base offense level for there being 25 or more victims who suffered a substantial financial hardship. *See* Am. Mot. [1041] at 8; Mem. [1042] at 22-23; Reply [1067] at 26-27; *see also* PSR [861] at 60 (filed under seal).  Ayelotan states "[t]he government erred when it told the district court during the trial that over 39,227 individuals had their credit card numbers and related account information stolen, and there were 250 or more victims during the time defendant was involved in the scheme."  Reply [1067] at 26.  He asserts that the Government did not contact the 39,227 individuals nor did it identify the 250 alleged victims, and it provided testimony only from a few purported victims.  *See id.* at 27.  Ayelotan charges that his Sixth Amendment rights were violated because his sentence was enhanced based upon "facts that were not presented to a jury nor admitted by him," and that only a two-level enhancement should have been applied. *Id.* at 29.   Ayelotan further contends that he cannot be held accountable for the conduct of others, *see id.* at 27, and that since he joined the conspiracy in 2004, he could not be held accountable for conduct before that time, *see* Mem. [1042] at 24.

b.      Trial counsel's Affidavit and the Government's Response

Trial counsel points out that he lodged an objection to the PSR concerning the

number of victims, citing the Objections attached as an exhibit to his Affidavit.  Aff.
[1057] at 3.  According to trial counsel, "[t]he issue was also argued at Sentencing."
*Id.*  The Government also references an objection raised at sentencing to victim
impact statements included in the PSR.  *See* Resp. [1065] at 5.  It states that for
calculation of the victim enhancement under U.S.S.G. § 2B1.1(b)(2)(C), the Court
properly found through the evidence presented at trial, the PSR, and victim impact
statements, that there was substantial financial harm to more than 25 victims.  *See
id.* at 5-6.

c.    Analysis

Ayelotan's offense level was increased by six levels under U.S.S.G.
§ 2B1.1(b)(2)(C) because the offense "resulted in substantial financial hardship to 25
or more victims."  U.S.S.G. § 2B1.1(b)(2)(C) (2016); *see* PSR [861] at 22, 60 (filed
under seal).  Ayelotan's collateral attack focuses upon the Government's and the
Court's alleged errors in determining the number of victims who sustained
substantial financial harm.  *See, e.g.,* Am. Mot. [1041] at 8; Mem. [1042] at 22-23;
Reply [1067] at 26-27.  A claim that the Court erred in its calculation of the
Guidelines is not cognizable in a § 2255 motion.  *See Segler,* 37 F.3d at 1134,
*Mitchell*, 2001 WL 803560, at *4.   Such a claim, and any claim concerning an
alleged error by the Government concerning the number of victims, could have been
raised on direct appeal but was not, and Ayelotan has not shown cause and
prejudice to overcome the procedural bar to raising those claims for the first time in
his § 2255 Motion.  *See Lopez*, 248 F.3d at 433.

To the extent Ayelotan may be arguing that his counsel was ineffective for

failing to raise an objection concerning the number of victims, he cannot show prejudice. Ayelotan's trial counsel did object to the inclusion of victim impact statements in the PSR, *see* PSR [861-3] at 5, an objection the Court overruled, Tr. [951] at 238. The Court determined at sentencing it was proper to consider the victim impact statements in determining whether U.S.S.G. § 2B1.1(b)(2)(C) applied. *See id.*

Under that Guidelines provision, if an offense resulted in "substantial financial hardship to 25 or more victims," the offense level is increased by six. U.S.S.G. § 2B1.1(b)(2) (2016).

> In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim—
> (i)    becoming insolvent;
> (ii)   filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);
> (iii)  suffering substantial loss of a retirement, education, or other savings or investment fund;
> (iv)   making substantial changes to his or her employment, such as postponing his or her retirement plans;
> (v)    making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and
> (vi)   suffering substantial harm to his or her ability to obtain credit.

U.S.S.G. § 2B1.1(b)(2) app. n.4(F) (2016).

Homeland Security Investigations Special Agent Todd Williams testified at sentencing that there were "hundreds of thousands of victims." Tr. [951] at 117. According to the Assistant United States Attorney, "some 1500 victims" had registered on a dedicated website after the Department of Justice employed a "large case victim notification system." *Id.* at 7. The victims had been identified based upon the content of Ayelotan's and his conspirators' e-mails and were provided

direct notification.  *See id.* at 228.

The PSR determined that the conspirators' fraudulent schemes "targeted a large number of victims, more than 25 of whom suffered substantial financial hardships such as becoming insolvent; losing retirement, educational, and other savings; making substantial changes to living arrangements; and suffering substantial harm to their ability to obtain credit."  PSR [861] at 15 (filed under seal).   The PSR supplied specific information concerning some of the victims' losses, which undoubtedly demonstrated that at least 48 of just those who had submitted victim impact statements had suffered substantial financial hardship as a result of Ayelotan's offenses of conviction.  *See* U.S.S.G. § 2B1.1(b)(2) app. n.4(F) (2016); *see also, e.g.,* PSR [861] at 26-59 (filed under seal) (discussing substantial financial hardship incurred by victims: (1) W.J.V.; (2) B.J.; (3) J.G.; (4) D.M.; (5) J.G.L.; (6) D.F.; (7) C.W.; (8) G.P.G.; (9) D.K.; (10) V.M.L.; (11) L.H.; (12) W.W.; (13) J.T.W.; (14) J.G.W.; (15) P.J.E.; (16) I.D.P.S.; (17) V.A.; (18) C.M.; (19) J.M.M.; (20) C.J.; (21) J.D.M.; (22) L.C.J.; (23) D.T.; (24) J.R.R.; (25) K.D.C.; (26) V.R.L.; (27) S.A.I.; (28) V.B.; (29) D.D.; (30) C.R.B.; (31) C.P.; (32) E.D.M.; (33) E.I.H.; (34) S.R.; (35) J.T.; (36) M.J.W.; (37) C.T.; (38) T.D.C.; (39) A.W.B.; (40) C.T.; (41) K.D.K.; (42) L.D.; (43) L.Q.; (44) C.L.R.; (45) C.G.; (46) L.G.; (47) M.B.; and (48) K.R.G.).  Because the PSR bore sufficient indicia of reliability, the Court properly considered it as evidence in making factual determinations, including the number of victims who sustained substantial financial hardship due to Ayelotan's conduct.  *See United States v. Zuniga,* 720 F.3d 587, 591 (5th Cir. 2013) ("Generally, a PSR bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual

determinations.").  Because the record is replete with evidence that there were more than 25 victims who sustained "substantial financial hardship," any objection to the enhancement under § 2B1.1(b)(2) would have been frivolous.  *See* U.S.S.G. § 2B1.1(b)(2) (2016).  Counsel was not ineffective for failing to raise a frivolous objection. *See Preston*, 209 F.3d at 785.

There is one other issue concerning this Guidelines provision that the Court feels should be addressed.  The original Indictment [3] against Ayelotan was returned in April 2014, and the Second Superseding Indictment [156] was returned in October 2014.  Both instruments charged Ayelotan with crimes beginning in at least 2001 and continuing until the dates of the Indictments.  *See, e.g.,* 2d Superseding Indictment [156] at 5, 27, 3-31; Indictment [3] at 5, 26, 29.  When the Second Superseding Indictment was returned, which would be the latest date of Ayelotan's criminal conduct, the 2013 Guidelines Manual was still in effect because the 2014 Manual did not go into effect until November 1, 2014.  However, in light of the sentencing date in May 2017, the Court used the 2016 Guidelines manual to calculate Ayelotan's Guidelines range.  *See* U.S.S.G. § 1B1.11 (2016); U.S.S.G. § 1B1.11 (2013).

The Guidelines direct that the Court should use the Guidelines Manual in effect on the date that a defendant is sentenced, but § 1B1.11 further states that, "[i]f the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed."  U.S.S.G. § 1B1.11 (2016); *see also*

34

U.S.S.G. § 1B1.11 (2013) (same).  Relevant here, the 2013 Guidelines provided that an offense level should be increased by six levels if the offense "involved 250 or more victims."  U.S.S.G. § 2B1.1(b)(2)(C) (2013).  This differs from the 2016 Guidelines provision used at sentencing, which required only 25 or more victims but added the provision that those victims must have suffered substantial financial hardship.  *See* U.S.S.G. § 2B1.1(b)(2)(C).  To the extent Ayelotan could be arguing that his attorney should have objected to the Court applying the 2016 version of this provision, rather than the 2013 version, he cannot show prejudice.

The 2013 Guidelines did not require victims to have incurred substantial financial hardship in order to be counted in U.S.S.G. § 2B1.1(b)(2).  That version only referenced the sheer number of victims involved in the offense, specifically 250 or more.  *See* U.S.S.G. § 2B1.1(b)(2) (2013).  The Application Notes broadly defined "victim" as "(A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense."  U.S.S.G. § 2B1.1 app. n.1 (2013).

The record in Ayelotan's case is replete with evidence that his offenses involved well over 250 victims.  For example, Agent Williams testified at sentencing that there were "hundreds of thousands of victims," Tr. [951] at 117, and the Assistant United States Attorney represented that "some 1500 victims" had registered on a dedicated website after the Department of Justice employed a "large case victim notification system," *id.* at 7.  Because the result would have been the same whether the 2013 or 2016 version of the Guidelines was applied, Ayelotan suffered no prejudice, and any ineffective assistance claim he may be making on

this basis fails.  *See Strickland*, 466 U.S. at 687-88.

5.  Ground Five: Multiplicity as to Counts 3 and 4

a.  Ayelotan's claims

This Ground contends that trial counsel was ineffective in failing to object to the multiplicity of the charges in the Second Superseding Indictment as to Counts 3 and 4 on the theory that Ayelotan was purportedly charged in multiple counts with the same offense.  *See* Am. Mot. [1041] at 10; Mem. [1042] at 25-29.  Ayelotan asserts that "this multiplicity violated his rights under the Double Jeopardy Clause because the underlying conduct is part of the same offense charged."  Mem. [1042] at 27.

b.  Trial counsel's Affidavit and the Government's Response

Trial counsel responds that "[w]hile Counts 3 and 4 of the Indictment both charge violations of 18 U.S.C. § 1341 & § 2 (Mail Fraud), they allege different transactions, on different dates."  Aff. [1057] at 3.  Counsel states that "[t]his argument makes no sense."  *Id.*  The Government answers that Ayelotan's multiplicity claim "fails in that each act alleged in Counts 3 and 4 is a separate and distinct violation of Title 18, U.S.C., Section 1341," as "Count 3 requires proof of a fact which Count 4 does not, and vice versa."  Resp. [1065] at 7.  "Count 3 involved a phone and occurred on September 26, 2011; Count 4 involved a check and occurred on December 14, 2011."  *Id.*  The "[f]ailure to raise and [sic] invalid defense is not ineffective."  *Id.*

c.  Analysis

"The Double Jeopardy Clause of the Fifth Amendment protects individuals

against multiple criminal punishments for the same offense." *United States v. Naidoo*, 995 F.3d 367, 380 (5th Cir. 2021) (citing U.S. Const. amend. V).  An indictment violates this prohibition "if it charges a single offense in separate counts." *Id.* (quotation omitted).   "[T]he test for determining whether the same act or transaction constitutes two offenses or only one is whether conviction under each statutory provision requires proof of an additional fact which the other does not." *United States v. Tucker*, 345 F.3d 320, 337 (5th Cir. 2003) (quotation omitted). "Moreover, whether a continuous transaction results in the commission of but a single offense or separate offenses is determined by whether separate and distinct prohibited acts, made punishable by law, have been committed." *United States v. Nguyen*, 28 F.3d 477, 482 (5th Cir. 1994) (quotation omitted).

Counts 3 and 4 both charged that Ayelotan violated 18 U.S.C. §§ 2 and 1341. 2d Superseding Indictment [156] at 30-31.   Count 3 alleged that Ayelotan caused "2 BlackBerry Torch smartphones" to be delivered to victim "N.J." on September 26, 2011, while Count 4 charged that he caused "Commerce Bank check $3,000" to be delivered to the same victim on December 14, 2011.  *See* 2d Superseding Indictment [156] at 30.  These charges allege separate and distinct acts of mailing committed on different dates, which were each a separate violation of § 1341, such that Counts 3 and 4 were not multiplicitous.  *See Nguyen*, 28 F.3d at 482; *see also, e.g., United States v. Hauze*, 501 F. App'x 638, 639 (9th Cir. 2012) (finding indictment was not multiplicitous because "[e]ach count of mail and wire fraud included in the indictment alleged a separate act of mailing or wiring").  Any multiplicity challenge as to Counts 3 and 4 would have been frivolous, and the failure to make a frivolous

objection does not constitute ineffective assistance of counsel.  *See Preston*, 209 F.3d at 785.  Ayelotan is not entitled to any relief on this Ground.

6.    Ground Six:  Extradition Treaty

a.    Ayelotan's claims

Ground Six asserts that Ayelotan's trial counsel "failed to challenge the term and agreement of the extradition treaty between the United States and South Africa."  Am. Mot. [1041] at 10.  According to Ayelotan, "the United States government assured the South Africa[n] government that he would not face a term that would require him [to] serve life imprisonment but he was sentenced to 1140 months (95) years in prison which is the same as a life sentence."  *Id.* at 30. Ayelotan charges that he would have "face[d] a term of no more than 10 years if tried in his Africa home and South Africa territory," and that trial counsel was ineffective by failing to challenge his "1,140 months sentence against the terms of the extradition treaty."  *Id.*

Ayelotan reasons that "if the government had included in the indictment it submitted to the South Africa government that he was facing life in prison i.e. 95 years the extradition would not have taken place, because it was made for the purpose of punishing defendant on account of his race and nationality which violates the agreement."  Reply [1067] at 34.  Ayelotan also claims his extradition violated the principles of dual criminality and specialty.  *See id.* at 33.

Ayelotan faults the Court for purportedly failing "to calculate and consider the § 3553(a) factors to select a reasonable sentence," Mem. [1042] at 32, and contends that his trial counsel rendered ineffective assistance "when he failed to

both object to sentence and argue the extradition treaty," *id.* at 33.  Ayelotan insists that his term of imprisonment violated the terms of the extradition treaty, and "[t]his error was created by counsel and government failure to correctly inform the district judge about the extradition agreement related to Ayelotan extradition," *id.* at 32, specifically the prescribed "maximum punishment for the offense[s]," which Ayelotan claims "rendered the extradition invalid," *id.* at 33.

b.    Trial counsel's Affidavit

According to trial counsel, Ayelotan "hired private counsel to represent him during his Extradition Hearings in South Africa.  The issue of extradition went to the highest levels of the Governments' [sic] of the United States, South Africa and Nigeria." Aff. [1057] at 4.  Trial counsel states that "[a]ll Governments agreed to allow the extradition," and that any alleged promise that Ayelotan would not face more than ten years in prison "was not in any documents [trial counsel] read, nor did the Defendant ever make [trial counsel] aware of such a promise."  *Id.*

c.    Government's response

The Government responds that the 1999 extradition treaty between the United States and South Africa contains no provision preventing the imposition of a life sentence, and the treaty speaks only of the death penalty.  *See* Resp. [1065] at 7. The Government maintains that there was not "any promise on behalf of the United States to South Africa as to the punishment potential, other that [sic] the statutory maximums for each count in the Second Superseding Indictment."  *Id.* at 7-8. Therefore, trial counsel "cannot be said to be ineffective for failure to raise the extradition treaty."  *Id.* at 7.

d.   <u>Analysis</u>

The Extradition Treaty (the "Treaty") between the Government of the United States of America and the Government of the Republic of South Africa reflects that the signatories "agree to extradite to each other, pursuant to the provisions of this Treaty, persons whom the authorities in the Requesting State have charged with or convicted of an extraditable offence."  Treaty, art. 1 (September 16, 1999), *available at* https://www.state.gov/wp-content/uploads/2019/02/13060-South-Africa-Extradition-September-16-1999.pdf (last visited Aug. 3, 2023).  An extraditable offense under the Treaty includes one that is "punishable under the laws in both States by deprivation of liberty for a period of at least one year or by a more severe penalty."  *Id*., art. 2.  Article 5 of the Treaty contains a provision prohibiting extradition, without certain assurances, when the offense is punishable by death, but it does not include any similar article or reference with respect to limiting the length of the term of incarceration.  *See id.*, art. 5.

(1)   <u>Length of Ayelotan's term of imprisonment</u>

Ayelotan maintains that the United States Government assured South African officials that he would not face a term of life in prison.  *See* Mem. [1042] at 30.  To the extent Ayelotan can raise such an ineffective assistance claim in a § 2255 proceeding, it fails.  No offense for which Ayelotan was charged or convicted in this case carried a potential sentence of life imprisonment.   *See* 2d Superseding Indictment [156].   While his advisory Guidelines imprisonment range would have been life, the relevant statutory maximum sentences reduced his Guidelines range to 1,140 months incarceration.  *See* PSR [861] at 64.  Ayelotan was ultimately

committed to the custody of the Federal Bureau of Prisons for a total of 1,140 months, not life. *See* J. [877] at 3. Therefore, Ayelotan's arguments concerning any misrepresentation of sentence are without merit. Any objection would have been frivolous, and Ayelotan cannot show prejudice, meaning that his ineffective assistance of counsel claim is plainly without merit. *See Strickland*, 466 U.S. at 687-88; *Preston*, 209 F.3d at 785.

    (2)    <u>Allegedly discriminatory extradition</u>

    Liberally construing his pro se allegations, Ayelotan appears to assert that the United States violated Article 4 of the Extradition Treaty, which precludes extradition if South Africa were to determine "there are substantial grounds for believing that the request has been made for the purpose of prosecuting or punishing a person on account of that person's gender, race, religion, nationality, or political opinion." Mem. [1042] at 31-32 (quoting Treaty, art. 4(3)); *see* Reply [1067] at 34 (same). Ayelotan references an Assistant United States Attorney's purported statement at the Pretrial Conference concerning plea offers to Defendants, alleging "that she is only offering the defendant from South Africa 10 years [sic] deal but only offered defendant 20 years [sic] plea." Mem. [1042] at 31. Ayelotan claims that had South African authorities been apprised of the length of sentence he was facing, "the extradition would not have taken place, because it was made for the purpose of purnishing [sic] defendant on account of his race and nationality which violates the agreement" and the Constitution. Reply [1067] at 34.

    Other than one alleged stray comment at the Pretrial Conference concerning nationality, Ayelotan offers nothing more than his conclusory assertion to support

this claim, and the transcript of the Pretrial Conference confirms that there were no such statements made by anyone.  Nor is it clear to which "defendant from South Africa" Ayelotan is referring.  *See* Mem. [1042] at 31.

At the final Pretrial Conference, the Court inquired of the Government what plea offers had been extended to the three Defendants proceeding to trial, Ayelotan, Raheem, and Mewase.  Both Ayelotan and Raheem had received an offer to plead to Count 9 of the Second Superseding Indictment, which carried a 20-year statutory cap.  *See* Tr. [997] at 8-9, 11.  The Government offered a plea deal to Mewase to Count 2, with a 5-year cap, and to an information charging an 18 U.S.C. § 371 conspiracy for mail and wire fraud, with another 5-year cap.  *Id.* at 15.  While Mewase's plea offer carried less sentencing exposure, *see id.*, all three Defendants were black males from Nigeria, not South Africa *see* PSR [861] at 4 (filed under seal) (Ayelotan); PSR [862] at 4 (filed under seal) (Raheem); PSR [863] at 3 (filed under seal) (Mewase).  In addition, the record is clear that Mewase's alleged conduct was demonstrably less egregious than that of Ayelotan and Raheem, and he was charged in fewer Counts in the Second Superseding Indictment.  *See* 2d Superseding Indictment [156].

The record conclusively establishes that Ayelotan's claims concerning the Assistant United States Attorneys' statements at the Pretrial Conference about nationality simply did not occur.  *See* Tr. [997].  "Similarly, speculative and unsupported accusations of government wrongdoing do not entitle a defendant to an evidentiary hearing."  *Reed*, 719 F.3d at 374.  Ayelotan's claim on this basis should be denied.

(3)   <u>Doctrines of dual criminality and specialty</u>

Ayelotan's claims that his counsel was ineffective in failing to argue that his extradition violated principles of "dual criminality" and "specialty" also lack merit. Mem. [1042] at 33-34.   The Extradition Treaty contains what is known as a "dual criminality" clause, specifically a provision stating that an offense is extraditable if it could be punished under the laws of both countries with more than one year of imprisonment.   *See* Treaty, art. 2; *see also, e.g., Balzan v. United States*, 702 F.3d 220, 221 (5th Cir. 2012) (discussing dual criminality).

Under the doctrine of specialty, the United States could not, without the permission of South Africa, punish an extradited individual for any crimes committed before the extradition except the crimes for which he was extradited. *See generally United States v. LeBaron*, 156 F.3d 621, 626 (5th Cir. 1998) (discussion of United States-Mexico treaty).   The United States-South African Extradition Treaty provides that

> [a] person extradited under this Treaty shall not be detained, tried, or punished in the Requesting State for an offence committed before his or her extradition other than an offence:
> (a)    for which extradition was granted or any other extraditable offence of which the person could be convicted upon proof of the facts upon which the request for extradition was granted, or is a lesser included offence;
> (b)    for which the executive authority of the Requested State consents to the person's detention, trial, or punishment.   For the purpose of this paragraph:
> > (i)    the Requested State may require the submission of the documentation referred to in Article 9; and
> > (ii)    the person extradited may be detained by the Requesting State for sixty (60) days, or for such longer period of time as the Requested State may authorize, pending the processing of the request.

Treaty, art. 17.

Ayelotan references the legal terms "dual criminality" and "specialty," but he has not explained how either principle was violated in his case, and he offers only conclusory assertions that he received ineffective assistance of counsel when his attorney failed to raise these issues, which "are insufficient to raise a constitutional issue." *Holmes*, 406 F.3d at 361; *see also, e.g., Reed*, 719 F.3d at 373 ("Conclusory allegations, unsubstantiated by evidence, do not support the request for an evidentiary hearing.").

(4)   Court's consideration of the § 3553(a) factors

Finally, as for Ayelotan's claim that the Court "failed to calculate and consider the § 3553(a) factors to select a reasonable sentence," Mem. [1042] at 32, this was an argument that could have been raised on direct appeal, and the Court at sentencing did in fact consider these factors and articulated the ones it found to be relevant, *see* Tr. [951] at 266-68.  Ayelotan's allegations concerning the Court's failure in this regard are clearly belied by the record and are without merit.  *See id.*

7.   Ground Seven:  Failure to provide transcripts and jury instructions for preparation of Motion

a.   Ayelotan's claims

Ground Seven claims that Ayelotan's trial and appellate counsel failed to provide him jury instructions and trial and sentencing transcripts, hampering his ability to prepare and file a § 2255 motion.  *See* Am. Mot. [1041] at 10-11; Mem. [1042] at 35; Aff. [1042-1] at 4.  Ayelotan further asserts that he was entitled to transcripts of prior proceedings under 18 U.S.C. § 3006A(e)(1) and the Constitution,

and that the transcript of his trial was necessary for him "to present an effective defense for his subsequent proceeding." Reply [1067] at 37.

Ayelotan contends that his due process rights were violated, citing a criminal defendant's right to a speedy trial and the alleged "delay of access" to courts he suffered because he was denied "his Legal Materials." Mem. [1042] at 35-36. He next faults trial counsel for failing to object to a continuance of the trial date requested by the Government from September 8, 2015, to August 8, 2016, *see* Aff. [1042-1] at 3, and states that he "is entitled to recover under 42 U.S.C. § 1983 absent absolute or qualified immunity or other appropriate defenses," Mem. [1042] at 36.

b.    Counsel's Affidavits

Ayelotan's trial counsel states that he "never received a copy of the Transcript before being terminated as Counsel" at Ayelotan's request. Aff. [1057] at 4. Therefore, trial counsel "had no Trial Transcript to give to the Defendant." *Id.*

Appellate counsel responds that he "provided copies of pleadings and any applicable supporting documentation to Ayelotan throughout the appeal." Aff. [1049] at 2. Ayelotan requested that appellate counsel "prepare and submit a copy of the entire record and transcript for his personal use," but "the duplication and submission of the entire record was cost and logistically prohibitive." *Id.* Appellate counsel points out that "due to Bureau of Prison policy, [he] could not submit the record via electronic media (i.e. jump drive, etc.) and, accordingly, [he] advised

Ayelotan of that issue." *Id.*[15]

c.   Government's response

According to the Government, the authority Ayelotan cites to support this

Ground involve § 1983 "civil rights actions and involve speedy trial issues."  Resp.

[1065] at 8.  Ayelotan's convictions and sentences have been upheld on appeal, and

he was afforded a direct appeal through counsel in a timely manner.  *See id.*  Thus,

Ayelotan "suffered no loss of redress in terms of speedy trial or appeal," and based

upon his trial and appellate counsels' affidavits, "Ayelotan has been afforded every

right and opportunity available."  *Id.*

d.   Analysis

(1)   Any civil claim

As for Ayelotan's claim that he "is entitled to recover under 42 U.S.C. § 1983

absent absolute or qualified immunity or other appropriate defenses," Mem. [1042]

at 36, any potential civil claims are not currently before the Court.   Therefore, any

§ 1983 or *Bivens*-type claim for monetary damages is denied without prejudice.

(2)   Transcripts

Ayelotan's assertion that his ability to prepare and file a § 2255 motion was

hampered because his trial and appellate counsel failed to provide him jury

instructions[16] and the trial and sentencing transcripts does not warrant relief.  *See*

---

[15] Ayelotan disputes the Bureau of Prisons policy that appellate counsel references, *see* Reply [1067] at 38-39, but even if the Bureau of Prisons permitted such electronic media, the result would not change.  Ayelotan still has not shown that he is entitled to relief under § 2255.

[16]  The Court's instructions to the jury were marked as Court's Exhibit C-5 for identification purposes only and were not filed in the record.  *See* Ex. List [795] at 1.  However, the instructions were read into the record and are documented in the trial transcript, which is

Am. Mot. [1041] at 10-11; Mem. [1042] at 35; Aff. [1042-1] at 4.   Ayelotan makes only conclusional allegations that these transcripts, which are public records available on the Court's docket through its PACER (Public Access to Court Electronic Records) service, would have assisted him with preparing his § 2255 Motion, but he does not adequately explain why they were needed.   Ayelotan was present for all proceedings, and conclusional allegations that he needed the transcripts are insufficient to require an evidentiary hearing.  *See Duran*, 934 F.3d at 411.

Ayelotan did request that the Court provide him copies of transcripts after the Government had already responded to the § 2255 Motion, *see* Resp. [1065]; Mot. [1066], but the Court properly denied this request, *see* Text Order, Feb. 3, 2022 (citing 28 U.S.C. § 753(f).

> Fees for transcripts furnished in proceedings brought under section 2255 of this title to persons permitted to sue or appeal in forma pauperis shall be paid by the United States out of money appropriated for that purpose if the trial judge or a circuit judge certifies that the suit or appeal is not frivolous and that the transcript is needed to decide the issue presented by the suit or appeal.

28 U.S.C. § 753(f).  At the time that Ayelotan sought the transcripts, none were needed to resolve the issues presented in his § 2255 Motion.  *See* Text Order, Feb. 3, 2022.

(3)   Speedy trial

Turning to Ayelotan's speedy trial arguments, *see* Mem. [1042] at 35-36; Aff. [1042-1] at 3, he offers only conclusory assertions regarding how his attorney was

---

available to the public on the docket.  *See* Tr. [939] at 3-43.

ineffective or how he was prejudiced, *see* Mem. [1042] at 35-36; *see* Aff. [1042-1] at 3. Conclusional allegations do not warrant an evidentiary hearing. *See Duran*, 934 F.3d at 411; *Reed*, 719 F.3d at 373.

Even had Ayelotan's trial counsel objected, his objection would have been overruled. Ayelotan specifically references the Government's request for a continuance of trial from September 8, 2015, to August 8, 2016. *See* Aff. [1042-1] at 3. The Government filed a Motion [371] to Continue on August 12, 2015, citing the need to provide counsel adequate time to prepare "given the complexity of the case, the amount of discovery and the number of defendants." Mot. [371] at 1. Ayelotan's counsel responded that "there is no way he can be prepared and ready for Trial on the scheduled date." Resp. [379] at 1. The Court granted the Government's Motion [371] and moved the trial from its September 8, 2015, trial docket to a special criminal trial calendar beginning August 8, 2016.

Had Ayelotan's counsel objected to the Government's request, the result would have been the same. The underlying criminal proceeding was an unusual and highly complex case involving multiple Defendants set for trial. 18 U.S.C. § 3161(h)(7)(B)(ii). The Court considered the Government's Motion [371] on the merits and granted it under 18 U.S.C. § 3161(h)(7)(B)(ii) and (iv), considering the unusualness or complexity of the case as well as the reasonable time necessary for effective preparation, taking into account the exercise of due diligence. *See* Text Order, Aug. 25, 2015. Considering the number of Defendants, the nature of the prosecution, and the existence of novel questions of fact or law, the Court found it unreasonable to expect adequate preparation for pretrial proceedings or for the trial

itself within the time limits established by the Speedy Trial Act. *See id.*

With the record in this case at that time, the denial of a trial continuance would have constituted plain error, and no objection by Ayelotan's trial counsel would have changed the result. Trial counsel's alleged failure to make a frivolous objection cannot constitute ineffective assistance of counsel. *See Preston*, 209 F.3d at 785. Moreover, trial counsel admitted that additional time was necessary for him to prepare on Ayelotan's behalf for trial. *See* Resp. [379] at 1. Ground Seven of Ayelotan's § 2255 Motion should be denied without an evidentiary hearing.

8. <u>Ground Eight: Trial counsel's alleged failure to meet and prepare for trial</u>

In his unsworn "Affidavit," Ayelotan claims that his trial counsel failed to meet with him and adequately prepare for trial. *See* Aff. [1042-1] at 2. Ayelotan states that trial counsel

> only visited me once at the Harrison County jail court house [sic], at the back of the court to show me the case discovery on his laptop. His previous visit was to discuss plea-agreement only which he also failed to negotiate. He didn't prepare for the trial which caused my guilty verdict because he only met with me once before the trial. He only dicuss [sic] our defense at the court house [sic] before each court section [sic] right before the trial.

*Id.*

First, Rule 2 of the § 2255 Rules requires that an application be signed under penalty of perjury. *See* Rule 2(b)(5) of § 2255 Rules. While Ayelotan's Amended Motion [1041] is signed under penalty of perjury, it does not contain this ground for relief. *See* Am. Mot. [1041]. His purported Affidavit submitted along with the Amended Motion [1041] contains these additional allegations, but it is not executed under penalty of perjury. *See* Aff. [1042-1]. In his so-called Affidavit, Ayelotan

offers only conclusory allegations that his trial counsel inadequately prepared for trial and that this purported failure to prepare for trial prejudiced him and "caused [his] guilty verdict." *Id.* at 2.  However, "[c]onclusory allegations, unsubstantiated by evidence, do not support the request for an evidentiary hearing." *Reed*, 719 F.3d at 373.

Despite being afforded the opportunity to file an amended § 2255 Motion, with respect to Ground Eight Ayelotan has not "present[ed] independent indicia of the likely merit of [his] allegations," *Reed*, 719 F.3d at 373, that would support a claim of ineffective assistance of counsel, *see* Aff. [1042-1] at 2; *Strickland,* 466 U.S. at 687-88; *see also, e.g., Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984) (affirming the denial of a § 2254 habeas petition and holding that "brevity of consultation time between a defendant and his counsel, alone, cannot support a claim of ineffective assistance of counsel").  This portion of Ayelotan's Amended Motion [1041] should therefore be denied without an evidentiary hearing.  *See Reed*, 719 F.3d at 373.[17]

---

[17] Ayelotan makes a statement concerning trial counsel visiting him in jail only to discuss a plea agreement, which counsel purportedly "failed to negotiate." Aff. [1042-1] at 2. As with Ayelotan's other statements in Ground Eight of the Affidavit, this is a conclusory allegation, unsubstantiated by evidence, and does not warrant an evidentiary hearing. *See id.*; *Reed*, 719 F.3d at 373. The statement concerning the plea also appears contradictory, as it is unclear how counsel could have been discussing a plea agreement with Ayelotan if he had never negotiated one. *See* Aff. [1042-1] at 2. Moreover, at the Pretrial Conference, Ayelotan agreed under oath that the Government had offered him a plea agreement to Count 9 with a 20-year cap, with the possibility of a further reduction to 15 years if he were to provide cooperation. *See* Tr. [997] at 10-14. Ayelotan testified that he had discussed the Government's offer with his attorney, was able to ask his attorney any and all questions about that offer, understood all of his attorney's answers, and understood fully and completely the Government's offer, but that he had decided to forgo the offer and proceed to trial. *See id.* at 13-14. "[S]olemn declarations in open court carry a strong presumption of verity," *United States v. McKnight*, 570 F.3d 641, 649 (5th Cir. 2009), and Ayelotan's vague

9.     Ground Nine:  Appellate counsel's purported failure to communicate

In Ground Nine, which was also raised in the "Affidavit" and not executed under penalty of perjury, Ayelotan claims that his appellate counsel was ineffective in failing to communicate with him.  *See* Aff. [1042-1] at 4.  According to Ayelotan, counsel purportedly failed to initially notify him of his appointment until Ayelotan sent a letter to the Court.  *See id.*  Counsel then "failed to input issues [Ayelotan] want[ed] to raise on [his] Appeal after sending him numerous letters" requesting that certain issues and cases be cited in the record, purportedly causing Ayelotan to lose the appeal.  *Id.*

Appellate counsel avers that he "devoted extensive time and effort in a full review of the record" and "also made a considerable effort in keeping Ayelotan informed and updated during the entire process." Aff. [1049] at 1.  Counsel submitted Ayelotan's brief to the Fifth Circuit based upon his "research of the law and experience as a practicing attorney . . . addressing the most pertinent issues that were prevalent in the trial." *Id.* at 2.  According to appellate counsel, he provided Ayelotan "copies of pleadings and any applicable supporting documentation to Ayelotan throughout the appeal," and Ayelotan "sent several letters to [counsel's] attention thanking [him] for all the efforts made in handling the appeal and keeping him informed." *Id.*

Again, despite Ayelotan being given an opportunity to amend his § 2255 Motion and signing his Amended Motion [1041] under penalty of perjury as

_____

and conclusory statements in Ground Eight, not signed under penalty of perjury, that his attorney failed to negotiate a plea agreement do not entitle him to an evidentiary hearing on his § 2255 Motion, *see* Aff. [1042-1] at 2; *Reed*, 719 F.3d at 373.

required by Rule 2 of the § 2255 Rules, Ayelotan placed this Ground in his unsworn

Affidavit [1042-1], which was not executed under penalty of perjury.  *See* Aff. [1042-

1]; Rule 2(b)(5) of § 2255 Rules.  As for the substance of Ground Nine, Ayelotan has

not specifically identified any issues that he wanted appellate counsel to raise on

appeal, or cases that he wanted counsel to cite.  *See* Aff. [1042-1] at 4.  He makes

mere conclusory and unsubstantiated statements, not under penalty of perjury, that

his appellate counsel was ineffective and that he was prejudiced, *see id.*, but

"[c]onclusory allegations, unsubstantiated by evidence, do not support the request

for an evidentiary hearing," *Reed*, 719 F.3d at 373.

Moreover, "[c]ounsel does not need to raise every nonfrivolous ground of

appeal available."  *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999)

(quotation omitted).[18]  To the extent that appellate counsel was constitutionally

required to confer with Ayelotan on any legal issues to be presented on appeal,[19] the

unidentified issues and cases that Ayelotan purportedly sought included could very

---

[18] *See also, e.g., Smith v. Robbins*, 528 U.S. 259, 288 (2000) (reversing and remanding the grant of a new direct appeal on a § 2254 habeas petition, and stating that "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal"); *United States v. Redd*, 619 F. App'x 333, 337 (5th Cir. 2015) (holding that "[a]ppellate counsel need not raise every nonfrivolous appellate issue, but should instead select issues that will maximize the likelihood of success on appeal," and that "conclusory contentions that the [defendant's] proposed sentencing claims were stronger than the appellate issues presented by [counsel] and that such claims would likely have succeeded if raised are insufficient to support a constitutional claims of ineffective assistance").

[19] *But see, e.g., Hooks v. Roberts*, 480 F.2d 1196, 1197 (5th Cir. 1973) ("At the threshold, we lay to rest appellant's notion that appointed counsel prosecuting an appeal on an adequate trial record is constitutionally required to confer with his client about the legal issues to be presented on appeal."); *United States v. Kiel*, No. 1:13CR51-LG-RHW-2, 2018 WL 9669919, at *3 (S.D. Miss. Aug. 16, 2018) (noting that the "same reasonableness standard applies to claims of deficient performance on appeal" as at trial, "[b]ut appellate counsel is not 'constitutionally required to confer with his client about the legal issues to be presented on appeal'" (quoting *Hooks*, 480 F.2d at 1197)).

well have been frivolous, which would necessarily mean that appellate counsel was not ineffective in not raising them.  *See, e.g., Preston*, 209 F.3d at 785 (holding that failing to make a frivolous objection cannot constitute ineffective assistance of counsel); *United States v. Merritt*, 24 F.3d 240, 1994 WL 242561, at *3 (5th Cir. May 24, 1994) (holding that, because a defendant's argument was frivolous, "his attorney's failure to raise it on appeal does not amount to ineffective assistance of counsel").

Even if nonfrivolous, Ayelotan "has not demonstrated [any] issue he sought to pursue was clearly stronger than the issue counsel pursued on direct appeal," which precludes a finding of deficient performance.  *United States v. Williams*, 476 F. App'x 1, 2 (5th Cir. 2012).   Nor has Ayelotan identified any "rare," "directly controlling precedent" on a "discrete, purely legal issue" that appellate counsel failed to cite in his brief and that denied him adequate representation on appeal. *Williamson*, 183 F.3d at 463 & n.7.

Finally, Ayelotan has not articulated how "it is 'reasonably likely' the result [of his appeal] would have been different" had counsel raised any specific issue or cited any case that he purportedly requested be included, which would be necessary to demonstrate prejudice.  *Harrington*, 562 U.S. at 111; *see* Aff. [1042-1].   Even if Ayelotan has adequately alleged deficient performance, failure to establish prejudice defeats his ineffective assistance claim in Ground Nine.  *See Strickland*, 466 U.S. at 687-88; *Tucker*, 115 F.3d at 280.

In sum, accepting all of Ayelotan's allegations as true, he has not demonstrated that he is entitled to any relief under § 2255, and his Motions [1026],

[1041] should be denied without an evidentiary hearing.

### III.  CONCLUSION

Because the Motion, files, and records conclusively show that Ayelotan is entitled to no relief, the Court finds that his Motion [1026] and Amended Motion [1041] to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody pursuant to 28 U.S.C. § 2255 should be denied without an evidentiary hearing.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendant Oladimeji Seun Ayelotan's Motion [1026] and Amended Motion [1041] to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody pursuant to 28 U.S.C. § 2255 are **DENIED**.

**SO ORDERED AND ADJUDGED**, this the 22nd day of August, 2023.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE